IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 06-30041 |
| ) | |
| LARRY W. NORWOOD, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This cause comes before the Court on Defendant's Motion to Suppress Evidence (d/e 10). The motion is fully briefed, and pursuant to Local Rule 72.1, the District Judge has referred the matter to me for an evidentiary hearing and Report and Recommendation. After carefully considering all of the submissions of the parties, hearing evidence on the matter, and pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that the Motion to Suppress be DENIED.

I. BACKGROUND[1]

Defendant Larry W. Norwood is charged with possession of 100 or more kilograms of marijuana with intent to distribute. Based upon the testimony heard in open court, Norwood was driving a tractor-trailer

---

[1] **This Report and Recommendation is prepared without the benefit of a transcript.**

northbound on Interstate 55 in Illinois near mile marker 101 at approximately 4:50 p.m. on April 24, 2006.  At that time, he was stopped by Trooper Nathan Miller of the Illinois State Police.  A subsequent search of the cab of Norwood's truck uncovered the marijuana at issue, and the instant one-count Indictment (d/e 5) followed.  Norwood has filed a Motion to Suppress the physical evidence seized from the cab of his truck and all written or oral statements that are alleged to have been made by him to members of the Illinois State Police at the time of and subsequent to his arrest.

     The matter came before this Court for evidentiary hearing on August 21, 2006.  The Government called two witnesses, Trooper Miller and Sergeant Terry Carter, both of the Illinois State Police.  Trooper Miller testified as follows.  At approximately 4:50 p.m. on April 24, 2006, Trooper Miller was stationed at mile post 101 on Interstate 55.  He observed a tractor-trailer traveling northbound on I-55.  Trooper Miller noted that the cab, or tractor, of the tractor-trailer was not marked with identification as to the trucking company, in violation of Motor Carrier Safety and Department of Transportation regulations.  Trooper Miller further noted that the unmarked tractor-trailer was following the truck in front of it too closely.

Trooper Miller pulled his squad car up next to the cab, to confirm that it was unmarked. After making confirmation, Trooper Miller fell in behind the tractor-trailer and initiated a traffic stop.

The tractor-trailer did not stop immediately, rather it traveled approximately two miles before pulling over to the side of the road at an exit to Sherman, Illinois. Trooper Miller approached the cab and asked the driver, identified as Defendant Norwood, for paperwork, including Norwood's log book, bills of lading, receipts, and registration. Trooper Miller informed Norwood that he was going to conduct a Motor Carrier Safety (MCS) report, and Norwood accompanied Trooper Miller back to Miller's squad car. Trooper Miller testified that Norwood was polite when he was asked for the paperwork and asked to exit the cab.

The MCS report is a one-page federal form. Trooper Miller stated that it generally takes him 35 to 40 minutes to complete the MCS form, which includes time spent reviewing paperwork and interviewing the truck driver. When he reviewed Norwood's paperwork, Trooper Miller noticed that the load had been picked up in South Texas and was destined for Massachusetts. Given this information, Trooper Miller thought it odd for Norwood to be traveling this area of I-55. Indeed, Miller testified that it was

an "unusual" route of travel.

As he continued to review paperwork, Trooper Miller received information from dispatch that a criminal background check revealed that Norwood had a past arrest for marijuana trafficking. Trooper Miller testified on cross-examination that he decided that he wanted to search Norwood's tractor-trailer based on the unusual route, Norwood's past history, a note in the log book, and what he described as Norwood's lethargic demeanor. Trooper Miller testified that he asked Norwood if he would consent to a search and Norwood responded that he would. Miller testified that he had several conversations with Norwood regarding this consent. Based on the issues raised by Defendant in the instant Motion to Suppress, the Court examines these conversations in detail.

Trooper Miller testified that his squad car was equipped with an in-car video camera which was set to record the area directly in front of the car. Miller also had a wireless microphone on his person to record audio to the in-car camera. The camera had a time and date stamp. Miller testified that the microphone reception fades as he gets further away from

the squad car. Miller testified on cross-examination that he could turn the microphone recording off from the unit that he carried on his person.

The Government introduced a DVD containing video and audio recordings from Trooper Miller's in-car camera as Exhibit 1.[2] The recording captured conversations between Norwood and Trooper Miller as the men sat in the squad car. While he was reviewing the paperwork, at approximately 4:59:13 p.m., Trooper Miller asked Norwood, "Is that a reefer?" This question was caught on tape. Miller explained that a reefer is a term for a refrigerated trailer. Norwood responded that it was. The trailer at issue was a white refrigerated unit. Trooper Miller testified that Norwood was hauling produce in it.

From 5:00:26 p.m. to 5:00:43 p.m., the recording captured a dispatcher informing Trooper Miller that a criminal background check revealed that Norwood had a past arrest for marijuana trafficking. Miller then questioned Norwood about this past occurrence. At 5:01:57 p.m., Trooper Miller asked Norwood "would you give us consent to a search?"

---

[2]The DVD submitted by the Government at the hearing contained only excerpts of the in-car camera's recordings during the Norwood traffic stop. At the conclusion of the hearing, with leave of Court, the Government retained Exhibit 1 and substituted a DVD with the complete recording of the traffic stop. The Government submitted a copy of the complete recording to chambers as well and I reviewed the video, in total, on August 22, 2006. The parties had no objection to the Court reviewing the DVD in chambers.

Norwood responded, "Yeah."  Trooper Miller testified that he did not inform Norwood that he could refuse consent.

Trooper Miller testified that, for officer safety reasons, he did not search the tractor-trailer immediately.  Miller testified that he wanted to keep his eyes on Norwood's face and hands and not direct his attention elsewhere.  At that time, Miller was the only trooper on the scene, and he continued to complete the MCS form as he waited for back-up to arrive.  Trooper Miller testified that he informed Norwood that he would be issuing him several written warnings.  At 5:12:28 p.m., the recording captured Miller telling Norwood, "I appreciate your consent to search."  Trooper Miller testified that he continued to go through the log book and complimented Norwood on it being "well-done."  At 5:16:20 p.m., the recording captures Norwood telling Miller, "There's no bedding, nothing in the truck."  Miller responded to the effect:  "I am glad you said that, It is something I would have noticed when I searched."

At 5:24:47 p.m., the recording captures Trooper Miller informing Norwood that he was not going to tear apart his truck.  Trooper Miller testified that his family owns a trucking business and he had driven tractor-

trailers for 18 years. Miller stated that in the trucking business "truck" generally means the tractor.

At 5:26:17 p.m., Trooper Miller issued the written warnings. Norwood stated that he wanted to smoke a cigarette. The two men walked up to the cab so Norwood could retrieve one. Trooper Miller testified that, while the men were by the cab, Norwood asked the trooper whether he wanted to search then. The trooper responded that he would wait. This conversation was not captured on the recording. As the men passed the trailer, Norwood again asked the trooper if he wanted to search then. The trooper again responded, "I'll wait." This second exchange was captured on the recording at 5:30:10 p.m. Trooper Miller testified that the first conversation related to a search of the cab while the second one referred to a search of the trailer.

Trooper Miller testified that Sergeant Carter and Trooper Coady arrived on the scene as back-up. Trooper Coady assisted Trooper Miller with the search. The troopers searched the trailer first. Norwood opened the doors and Trooper Miller crawled up over the produce to search. Sergeant Carter watched Norwood as the other troopers searched. The search of the trailer revealed no contraband. Trooper Miller testified that

Norwood secured the doors, while Troopers Miller and Coady went to the cab. According to Miller, Norwood then sat on the hood of the squad car while Sergeant Carter watched him. From 5:42:40 p.m. to 5:43:34 p.m., the recording from the in-car camera shows Norwood and Sergeant Carter standing near the rear of the trailer. The video shows Sergeant Carter closing the trailer and Norwood securing the doors. It appears that Carter and Norwood then had a brief conversation. Trooper Miller testified that he did not know what was said in the conversation.

Trooper Miller testified that he found three large black duffel bags containing marijuana in the cab. After discovering the contraband, Trooper Miller returned to the squad car and placed Norwood under arrest. Trooper Miller advised Norwood of his Miranda rights and then asked him why he had consented to the search. Norwood responded that he believed the trooper would have searched even without his consent. Trooper Miller than discussed cooperation with Norwood, such as continuing on for a controlled delivery. Trooper Miller testified that Norwood never communicated a withdrawal of consent or stated that his consent was limited to a search of the trailer.

Sergeant Carter then testified. Carter, a 17-year veteran of the Illinois State Police, stated that he arrived on the scene at approximately 5:35 p.m. on April 24, 2006. Sergeant Carter stated that he watched Norwood while the other two troopers searched the tractor-trailer. Carter testified that he did not remember any specific conversation with Norwood during that time. Carter stated that Norwood never informed Carter that he was withdrawing his consent to search or talked about the scope of the consent. Sergeant Carter viewed the video recording of the time period from 5:42:40 p.m. to 5:44:43 p.m. which showed him and Norwood at the rear of the trailer. Carter testified that he did not recall exactly what the men were speaking about, but that he believed they were discussing closing the trailer doors properly. Carter stated that the other troopers were at the cab during this time, and Carter testified that he did not recall Norwood asking him about the whereabouts of the other troopers.[3]

Norwood then testified. He stated that he was fifty-six years old, with a high school education, and diabetic. When asked about the April 24, 2006 traffic stop, Norwood stated that he did not stop immediately upon

---

[3] The Court notes that the Defendant's behavior during his brief conversation with Sergeant Carter was not animated nor excited - Defendant appeared calm and unconcerned.

noticing the trooper's flashing lights, but rather proceeded to an area which he deemed to be relatively safe to pull over.  Norwood stated that he informed Trooper Miller that he was diabetic and needed to eat and take medications.  Norwood acknowledged that Trooper Miller asked to search the truck, but Norwood explained that, because they were discussing the bills of lading and the logbook, Norwood believed that the search would be only of the trailer.

    Norwood testified that he became aware that the troopers were searching the cab while he was with Sergeant Carter after the search of the trailer.  According to Norwood, after the troopers exited the trailer, he assumed that they were going to search the refrigeration unit on the front of the trailer, which has doors of its own.  Norwood testified that he asked Sergeant Carter where the other troopers were.  Norwood testified that Sergeant Carter informed him that the other troopers were searching the cab.  According to Norwood, he immediately told Sergeant Carter, "They don't have consent."

    Norwood testified that he did not believe he was consenting to a search of the cab, but rather of the trailer only.  According to Norwood, he based this opinion on the context of the conversation relating to consent.

However, Norwood testified on direct examination that, at one point, he made a statement about the cab, but the trooper "declined." Norwood further testified that he did not believe he had the right to refuse a search of either the trailer or the cab. On cross-examination, Norwood conceded that, at the time that the absence of bedding was discussed, he did not tell Trooper Miller that he could not search the cab, despite the fact that bedding would typically be found in the cab and not in the trailer. Norwood also stated that he was "just talking" to Sergeant Carter when he said there was no consent to search the cab because Norwood did not believe he could withhold consent.

The Government called Sergeant Carter in rebuttal. Carter testified that it would have been significant to him if Norwood would have told him that the troopers did not have consent to search the cab. Carter testified that, had Norwood made such a statement, he, as the supervising officer on the scene, would have directed the troopers to immediately cease the search.

## II.  ANALYSIS AND CONCLUSIONS OF LAW

Norwood has filed a Motion to Suppress the physical evidence seized from the cab of his truck and any statements allegedly made by him to

members of the Illinois State Police at the time of and subsequent to his arrest. Norwood asserts that the evidence that is the subject of his motion was obtained in violation of his rights under the Fourth and Fifth Amendments to the United States Constitution.

The Court turns first to the search of the cab of the tractor-trailer. The Fourth Amendment protects against unreasonable searches and seizures. The Fourth Amendment's prohibition against warrantless searches does not apply when law enforcement officials receive voluntary consent to search. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Grap, 403 F.3d 439, 442 (7th Cir. 2005). In Schneckloth, the Supreme Court stated that the question whether a consent to search was in fact voluntary is to be determined from the totality of the circumstances. Id. at 227. The Government bears the burden of proving by a preponderance of the evidence that the consent was voluntary. United States v. Sandoval-Vasquez, 435 F.3d 739, 744 (7th Cir. 2006). Whether consent is voluntary is a question of fact. Schneckloth, 412 U.S. at 227. Factors that a court must consider in analyzing whether consent was voluntary include:

> (1) the person's age, intelligence, and education; (2) whether he was advised of his constitutional rights; (3) how long he was detained before he gave his consent; (4) whether his consent was immediate, or was prompted by repeated requests by the

> authorities; (5) whether any physical coercion was used; and (6) whether the individual was in police custody when he gave his consent.

Sandoval-Vasquez, 435 F.3d at 744.

Norwood asserts that he gave Trooper Miller consent to search only the trailer portion of his vehicle, and alternatively, that any general consent that may have been given was withdrawn when he informed Sergeant Carter that the troopers did not have consent to search the cab. Considering all of the relevant factors, the Court believes that, based upon the testimony of Trooper Miller and Sergeant Carter, the Government has proven with "clear and convincing" testimony that the Norwood voluntarily consented to the search of the entire tractor-trailer and that this consent was never withdrawn.  The Court also finds that the Defendant was not detained for an unreasonable period of time between the stop and consent search.  Waiting for backup for officer safety is a valid reason for reasonable delay.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and suspect?" Florida v. Jimeno, 500 U.S. 248, 251 (1991).  "[A] suspect may delimit as he chooses the scope of the search to which he

consents." Id. at 252.  Even after consent has been given, a defendant maintains the ability to limit its scope or withdraw his consent altogether – provided that the withdrawal of consent occurs before any evidence of illegal activity is discovered.  United States v. Jachimko, 19 F.3d 296, 299 (7th Cir. 1994). However, it is up to the defendant to effectively communicate his intent to narrow the scope of his consent.  United States v. Hardin, 710 F.2d 1231, 1236-37 (7th Cir. 1983).

    Norwood is a fifty-six year old man with a high school education.  The Court recognizes that Norwood is diabetic.  Trooper Miller sought Norwood's consent to search at approximately 5:02 p.m., just twelve minutes after Miller first observed Norwood's tractor-trailer.  Norwood gave consent at that time and did not indicate any limitations on the scope of his consent.  The Court notes that Norwood gave his consent immediately and he was not subjected to repeated requests for consent.  However, Trooper Miller and Norwood discussed the search and Norwood's consent several other times before the actual search took place.  At 5:12:20 p.m., Trooper Miller thanked Norwood for his consent to search, given Norwood's criminal history.  Again, there was no evidence that Norwood made any indication as to limitations on the scope of his consent.

The recording captures a statement by Norwood at 5:16:20 p.m. that there is no bedding in the truck.  Miller responded that he was glad Norwood mentioned that because he would have noticed its absence in his search.  Although the evidence shows that bedding would normally be kept in the cab, Norwood again made no indication as to any limitation on the scope of his consent.

Trooper Miller testified that, as the two men were by the cab after retrieving a cigarette for Norwood, Norwood asked the trooper whether he wanted to go ahead and search.  Trooper Miller stated that he would wait.  While this comment was not captured on the recording, Norwood himself confirmed on direct examination that a search of the cab was mentioned at one point and the trooper "declined."

The Court further notes that there is no evidence of physical coercion and Norwood was not in police custody at the time he consented to the search.  It is undisputed that Trooper Miller did not advise Norwood of his right to refuse consent; however, this is only one factor for the Court's consideration.  Given the evidence set forth above, the Court finds by clear and convincing evidence that Norwood voluntarily consented to Trooper Miller's search of his entire tractor-trailer and that Norwood failed to effectively communicate any limitations on the scope of this consent.

The next issue for the Court's attention is whether this general consent was ever withdrawn by Norwood. Based on the evidence presented, the Court finds that it was not. The Court finds Norwood's testimony regarding his statements to Sergeant Carter to be uncredible.[4] Norwood stated that he first became aware of the search of the cab when he was with Sergeant Carter after the search of the trailer. However, as set forth above, there were several references during the course of Norwood's conversations with Trooper Miller, which would indicate to a reasonable person that Miller's search would include the cab. In fact, Norwood himself volunteered to Trooper Miller the information that there was no bedding in the truck, information that a reasonable person would deem to be relevant only if the search encompassed the cab. Moreover, Norwood repeatedly testified that he did not believe he could withhold his consent to search the cab. This testimony is consistent with the statement Norwood made just after his arrest that he gave consent because he believed that the troopers would search even without it. Therefore, based on the evidence presented, the Court finds that Norwood at no time withdrew his voluntary consent to a search of his entire tractor-trailer.

Turning to Norwood's request to suppress statements, the Court

---

[4] The Court finds the testimony of Trooper Miller and Sergeant Carter to be credible and corroborated by the contents of the DVD.

notes that Norwood fails to assert any basis for suppression of statements that is independent of the search in question. To the extent Norwood seeks to suppress such statements as the fruit of the challenged search, it is recommended that the Court reject his argument because, as set forth above, the search in question was a valid consent search and, as such, did not violate Norwood's Constitutional rights.

### III. CONCLUSION

For all the above reasons, I recommend that Defendant's Motion to Suppress Evidence (d/e 10) be DENIED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within ten working days after being served with a copy of this Report and Recommendation. See 28 U.S.C. § 636(b)(1). Failure to file a timely objection will constitute a waiver of objections on appeal. See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986); Local Rule 72.2.

ENTER: August 23, 2006

s/ Byron G. Cudmore
_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE